# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| UNGAVA TECHNOLOGIES INC, <br><br> *Plaintiff/Counterclaim Defendant*, <br><br> v. <br><br> INNERSPEC TECHNOLOGIES, INC, <br><br> *Defendant/Counterclaim Plaintiff.* | CASE NO. 6:17-cv-6 <br><br> <u>OPINION</u> <br><br> JUDGE NORMAN K. MOON |

    This diversity case involves a contract dispute about delays to the design phase of a product. The issue now before the Court is whether the contract requires arbitration.

    Plaintiff Ungava alleges that Defendant Innerspec "improperly terminated the Contract and has wrongly demanded that Ungava submit to arbitration." (Complaint ¶ 2). Ungava contends termination is improper for its (admitted) design and engineering delays, and that arbitration cannot occur regarding such delays until the parties engage in a contractual, pre-arbitration dispute resolution procedure. (*Id.*). So Ungava seeks to enjoin arbitration.

    Innerspec's counterclaim alleges Ungava breached the contract by failing to: (1) use its "best efforts" to complete the product design; (2) give priority to its work for Innerspec, and; (3) provide notice of known delays. (Counterclaim ¶¶ 4–7). Innerspec asks Ungava be compelled to participate in arbitration, and it requests a declaration that it properly terminated the contract. (*Id* ¶ 10; dkt. 7).

    The Court holds that the contract plainly provides for arbitration of this case. Accordingly, the motion to enjoin arbitration will be denied and the motion to compel it will be granted.

## I. RELEVANT CONTRACTUAL PROVISIONS

The parties entered into an agreement whereby Ungava would design and engineer for Innerspec two products relating to pulsar technology. (Dkt. 1-1 (hereinafter "Contract"), §§ 1.1–1.2). Ungava agreed to use its "best efforts" to produce the first batch of "Product #2" by the second quarter of 2015. (Contract § 1.5). Under Section 7, the contract terminates after seven years, or "can be terminated" prior to seven years upon the occurrence of one of four events which are not presently relevant. (Contract §§ 7.1–7.2).

Section 9 of the contract addresses dispute resolution, and reads in relevant part as follows:

> The parties agree that **any dispute, conflict or claim arising under this Agreement, in particular concerning its formation, existence, validity, effects, interpretation, implementation, violation, resolution or annulment, shall be finally resolved by means of arbitration using a panel of three people**. Two will be nominated by UNGAVA and INNERSPEC respectively. The third person will be an industry expert agreed upon by both parties. The decision of the arbitration panel shall be by majority of the panel and shall be final as to the matters resolved and fully enforceable in a court of law. The parties shall share any expenses incurred for the resolution of the dispute.

(Contract § 9.1 (emphasis added)).

Section 1 addresses the "Design & Engineering" phase of the contract. Importantly, Section 1.7 reads:

> INNERSPEC understands that UNGAVA will be doing a best effort [*sic*] to execute the design, engineering and prototyping with the understanding that INNERSPEC will have priority over other work received after INNERSPEC's purchase order. Any delays on the above mentioned scheduled with the plans to remedy them will be provided to INNERSPEC as soon as the delay is known. **If the delay is foreseen to be longer than 4 months, INNERSPEC and UNGAVA will meet to find a solution agreeable to both parties. If an agreement cannot be found, a panel of 3 people as per Section 9 will convene to assess the situation and determine the course of action.**

(emphasis added).

## II. THE COMPLAINT

Ungava admits it experienced delays in producing a prototype of Product #2, but says it timely notified Innerspec of the delays. (Complaint ¶¶ 19–20). Ungava avers that, rather than follow the dispute resolution mechanism in § 1.7 for design delays, Innerspec "continued to request that Ungava proceed with the development and prototyping of Product #2." (*Id*. ¶ 21). Although Ungava "was close" to completing a prototype in September 2016, Innerspec gave notice that "the Contract is cancelled and terminated." (*Id*. ¶ 22). On October 13, 2016, Ungava told Innerspec of its view that Innerspec could not unilaterally terminate the contract based on a delay during the design phase, but instead had to follow the dispute resolution procedure in § 1.7. (*Id*. ¶ 23). Innerspec responded by demanding arbitration pursuant to § 9.1. (*Id*. ¶ 24). Extensive correspondence between the parties and through counsel was unavailing. (*Id*. ¶ 25).

## III. THE COUNTERCOMPLAINT

Innerspec claims Ungava breached the Contract by failing: to use its best efforts to execute the design, engineering and prototyping; to give priority to work for Innerspec; and, to provide notice of delays. (Countercomplaint ¶¶ 4–7). Innerspec alleges that, pursuant to § 1.7, the parties "conferred and agreed" to resolve the delay problems by April 1, 2015. (*Id*. ¶ 7). This, according to Innerspec, "exhausted the procedures" in Section 1.7, so "there was never any further need or requirement to submit any unresolved dispute to a panel of three persons to solve the delay issue." (*Id*.). Nevertheless, based on Ungava's failures of performance, Innerspec terminated the agreement in September 2016. (*Id*. ¶ 8). Innerspec contends that "Ungava has refused to participate [in arbitration] . . . based on the invalid assumption that Innerspec has no right to terminate this Contract [despite the almost two year delay] unless and until the parties further submit" the matter to a three-person panel under § 1.7. (*Id*. ¶ 9).

## IV. ANALYSIS

The present issue in this case is straightforward: Does the contract require arbitration of the parties' dispute?[1] Under Virginia law, which governs per § 9.2, contract interpretation is question of law for the Court. *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 243 (Va. 2016); *Palmer & Palmer Co., LLC v. Waterfront Marine Const., Inc.*, 662 S.E.2d 77, 80 (Va. 2008). The contract's words are given their plain, usual, ordinary, and popular meaning. *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012). The Court also must keep in mind the congressionally mandated "strong federal policy in favor of enforcing arbitration agreements" under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq. Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 671 (4th Cir. 2016); *see Preston v. Ferrer*, 552 U.S. 346, 353 (2008).

For starters, the contract's arbitration provision, § 9.1, is exceptionally broad. It reaches "any dispute, conflict or claim" arising under the agreement, including those concerning its "interpretation," "existence," "validity," "effects," or "violation." Standing alone, § 9.1 would surely cover this case, given the nature of the disagreements between the parties.

The only complication is § 1.7 (addressing delays in the design phase foreseen to be longer than for four months), but that concern is more illusory than real. Read most naturally, § 1.7 provides a two-step process: The parties must first try to work out a solution. (Contract § 1.7 ("If the delay is foreseen to be longer than 4 months, INNERSPEC and UNGAVA will meet to find a solution agreeable to both parties.")). If they fail, then they proceed to arbitration, like

---

[1] Ungava's arguments as to each prong of the preliminary injunction analysis (likelihood of success, irreparable harm, damage to Innerspec, and public interest) all reduce to a fundamental contention: That the contract does not provide for arbitration in this instance. (*See* dkt. 4 at 8–11).

As for the motion to compel, the only disagreement about the relevant four-part test under *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002), is whether the arbitration provision covers the dispute, which again turns upon the meaning of the contract.

any other dispute under the contract. *Id.* ("If an agreement cannot be found, a panel of 3 people as per Section 9 will convene to assess the situation and determine the course of action."). Put differently, in the specific context of design/engineering delays, § 1.7 builds in a precondition to arbitration—attempt to play nice without outside supervision—backstopped by arbitration as provided in § 9.1.

An alternative understanding of § 1.7—that its second step creates, "per Section 9," a sort of quasi-arbitration panel that is *not* the *ultimate* arbitration panel but is assembled just like it and as a precondition to it—is an unnatural and implausible reading on the contract. Ungava, for instance, believes (although as we shall see, it later changes its tune) that § 1.7 creates three steps. First, meet-and-confer. Second, assemble and engage the quasi-arbitration panel. Third, if the parties still are at loggerheads, only then resort to full-fledged arbitration under § 9.1. (Dkt. 4 at 1, 7; *see* Complaint ¶¶ 18, 28, 32 (emphasis added); *see also* Prayer for Relief (a), (b)).

This is not an intuitive reading of § 1.7, but a stilted one that creates a Kafkaesque process: The parties must initially select a § 1.7 panel by § 9.1's methodology, and after the initial panel "determine[s]" what the parties must do, they then must (if still in disagreement) relitigate the very same matter before an identically-constructed § 9.1 panel. But why have two panels selected by the same parties via the same process, each of which tells the parties how to resolve the same dispute?

Ungava, in defending this setup, places great weight on an alleged distinction between § 1.7's statement that the (supposed) *first* panel preliminarily decides disagreements by "determin[ing] the course of action," whereas § 9.1 empowers the *second* panel to "finally resolve[]" them. Yet that interpretation collapses in on its own logic.[2] Ungava's reading offers

---

[2] For what it is worth, the Court also sees little space between a panel that "determines a

no explanation for how the parties escape an infinite loop of preliminary panels under § 1.7 regarding design delays to somehow reach a "final" decision before a § 9.1 panel.[3] After all, § 1.7 requires a meet-and-confer about such disputes, and (by hypothesis) then mandates a preliminary panel. But what if the parties disagree about the preliminary panel's decision on a design/engineering dispute, or encounter further disputes during implementation? Seemingly, § 1.7 would place them back at the meet-and-confer stage, caught in a vicious cycle of unsuccessful conferences, followed by a preliminary panel, followed by unsuccessful conferences, followed by a preliminary panel, and so on.

All this reveals why § 1.7 is best read as simply cross-referencing the § 9.1 arbitration process, not as creating a separate panel. But even if that were not true, the case is still arbitrable. The parties dispute whether the meet-and-confer requirement in § 1.7 has been satisfied, as well as the general meaning and application of § 1.7. But that provision addresses the preconditions to arbitration, the satisfaction of which is a matter for the arbitrator. The Supreme Court has explained that "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration . . . ." *BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1207 (2014).

Here, the parties present differing accounts of the extent to which they met-and-

---

course of action" (§ 1.7) and one that "finally resolve[s]" a matter. (§ 9.1).
    To "determine" something is simply "to fix [it] conclusively or authoritatively," which is to say, make it finally resolved. *See* https://www.merriam-webster.com/dictionary/determine; http://www.dictionary.com/browse/determine?s=t.

[3]     As explained below, rather than positing a rationale to avoid this absurd result, Ungava's reply brief embraces it, thereby abandoning its original interpretation of § 1.7 to argue that it provides a total and complete carveout from arbitration under § 9.1 for design and engineering delays. (*See* dkt. 11 at 4).

conferred, what—if any—agreements they reached as a result, and the import of those agreements. (*See* dkt. 4 at ECF 14–16; dkt. 8 at 2; dkt. 9 (Decl. of Innerspec's CEO) & attachments). And the parties disagree about whether it was necessary to consult the (hypothetical) three-person panel under § 1.7. In an analogous case, the Fourth Circuit has followed *BG Group*'s lead to compel arbitration.

> [T]he Franchisees contend that Dickey's *cannot arbitrate its dispute because it failed to first seek mediation as required by Article 27 of the franchise agreements*. According to the Franchisees, mediation is a condition precedent to invoking the arbitration provision, and so the motions to compel should be denied for this reason alone.
>
> As the Supreme Court has recently re-affirmed, however, *arbitrators—not courts—must decide whether a condition precedent to arbitrability has been fulfilled*. Accordingly, the Franchisees' argument must be decided by the arbitrator, not the court. Should the arbitrator decide that the Franchisees have no duty to arbitrate because Dickey's failed to satisfy the mediation condition precedent, the parties may then seek relief in court under the FAA.

*Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 565 (4th Cir. 2015) (emphasis added).

*Chorley* controls here and provides an alternative ground for decision. Ungava responds that the rule in *BG Group* and *Chorley* is an inapplicable, "limited exception" to the default rule that arbitrability is decided by the court. (Dkt. 11 at 2). It sets about distinguishing a 2002 U.S. Supreme Court case about a time-to-file provision, but that case was not relied upon by Innerspec, and Ungava does not distinguish the more analogous facts in *Chorley*.

Ungava does, however, switch horses midstream when it comes to the meaning of § 1.7. Ungava's reply brief states:

> Section 1.7 is **not** a mere procedural condition precedent that must be satisfied before the parties may proceed to arbitration; rather, Section 1.7 provides an altogether different – **and exclusive** – method for resolving delay disputes. If the parties cannot agree on a plan to resolve delays, they are required to submit the

dispute to a non-arbitral three-person panel . . . . This is the dispute resolution process to which the parties have agreed.

(Dkt. 11 at 4 (emphasis added)). This was not the theory of § 1.7 that Ungava originally espoused. Before being confronted with *Chorley*, Ungava asserted:

> Under the terms of the [Contract] between the parties, the parties did not agree to arbitrate disputes regarding delays during the design and engineering phase of Ungava's performance of the Contract **until the parties first avail themselves of a provision that calls for a panel of three persons** to convene to assess the dispute and determine the best course of action. **Because this meeting of the three-person panel has not occurred, the parties cannot proceed to arbitration under the contract's express terms**.

(Dkt. 4 at 1). The Complaint likewise makes Ungava's initial position clear.

> [T]he Contract provides for a **pre-termination *and pre-arbitration* step** in which a panel is convened to 'assess the situation and determine the course of action.'
>
> . . . .
>
> The Contract does not provide for the submission of disputes regarding delays during the design process to binding arbitration *unless* **the parties *first* satisfied the procedure set forth in Section 1.7**.
>
> . . . .
>
> . . . Ungava has no obligation to participate in arbitration of a dispute regarding delays during the design phase of the Contract *unless and until* **the parties have *first* complied with Section 1.7**.

(Complaint ¶¶ 18, 28, 32 (emphasis added); *see also* Prayer for Relief (a), (b)).

That Ungava so easily abandoned its original understanding of § 1.7 does not speak well for that interpretation, which the Court, of course, has already declined to endorse.

In sum, § 1.7 does not create a panel other than the arbitration one that exists through § 9.1. And even if it did, the case must still proceed to arbitration under *Chorley*.

All that remains, then, is what to do with this case: stay or dismiss it? The parties have not addressed the matter, and Fourth Circuit precedent on the question is unclear. *See Noohi v.*

> *Toll Bros.*, 708 F.3d 599, 605 n.2 (4th Cir. 2013) (noting conflicting lines of authority).
>
> The Fourth Circuit recently acknowledged that "[t]here may be some tension between our decision in *Hooters*—indicating that a stay is required when the arbitration agreement 'covers the matter in dispute'—and *Choice Hotels*—sanctioning dismissal 'when all of the issues presented . . . are arbitrable.'" *Aggarao v. MOL Ship Mgmt. Co.,* 675 F.3d 355, 376 n. 18 (4th Cir. 2012) (quoting *Hooters, Inc. v. Phillips,* 173 F.3d 933 (4th Cir. 1999); *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001)).
>
> Dismissal is appropriate here due to the fact that this case is directly analogous to *Choice Hotels*—"all of the issues presented . . . are arbitrable." *Choice Hotels Int'l, Inc.*, 252 F.3d at 709–10.

*Jarry v. Allied Cash Advance Virginia, L.L.C.*, 175 F. Supp. 3d 622, 627 (W.D. Va. 2016).

I adhere to my previous reading of precedent in *Jarry*, the rationale of which applies equally here. Therefore, this case will be dismissed without prejudice.

## SUMMARY

Because the arbitration provision in § 9.1 reaches the disputes in this case, Ungava's motion to enjoin arbitration will be denied, and Innerspec's motion to compel arbitration will be granted. The Clerk is directed to send a copy of this order to counsel of record.

ENTERED this __31st__ day of May, 2017.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE